UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

RONNIE BOONE,

                Plaintiff,                      Case No. 1:20-cv-10

v.                                     Honorable Janet T. Neff

MATT MACAULEY et al.,

                Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's amended complaint for failure to state a claim against Defendants Macauley, Stieve, Alken, Langdon, Ivens, Gregurek, Simon, Hutchinson, Corizon, Mary Corning, Robinson, Russel, Ritz, Trierweier, Boltom, Valentin, Kevin Corning, Orzula, Youngs, Hull, Athearn, and Sices.

<u>**Discussion**</u>

**I.      Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan.  The events about which he complains occurred at that facility.  Plaintiff sues Warden Matt Macauley, Doctor Jeffrey Stieve, Clinical Administrative Assistant Subrina Alken, Healthcare Unit Manager Joshua Langdon, Healthcare Regional Director Keith Ivens, Nurse Supervisor Sherri Gregurek, Bent Simon, P.A., Healthcare Regional Medical Director Craig Hutchinson, Corizon Health Inc., Mary R. Corning, R.N., Corrections Officer Unknown Gibson, Corrections Officer Unknown Bussinger, Grievance Coordinator M. Robinson, Grievance Manager Richard Russel, Jerry Ritz, R.N., Warden Tony Trierweier, Resident Unit Manager D. Boltom, Unknown Valentin, R.N., Kevin Corning, R.N., Library Assistant Unknown Orzula, Grievance Reviewer Manager B. Youngs, Corrections Program Coordinator Unknown Hull, Mental Health Service Supervisor Unknown Athearn, and Doctor Peter Sices.

Plaintiff alleges that he has physical and mental impairments that substantially limit major bodily functions and life activities.  Plaintiff states that he suffers from a spinal cord injury or tumor, and that he has a peripheral nerve disorder as the result of a gunshot wound.  Plaintiff's injuries have caused a chronic bladder, bowel, and digestive disorder requiring him to wear adult diapers.  Plaintiff also suffers from a traumatic brain injury, which has caused cognitive defects, memory impairment, major depression, borderline personality disorder, and migraines.  Plaintiff has Hepatitis C and sleep apnea.

Plaintiff is being treated with three or four types of laxatives, which cause him to have up to 10 watery stools a day.  On January 12, 2018, Plaintiff defecated on himself due to his medical condition.  Plaintiff told his cellmate, prisoner Lankford, to step out of the cell for a few

2

minutes so that he could clean himself.  Lankford left the cell and asked Defendant Gibson if he could go to the day room because of Plaintiff's bowel problems.  Defendant Gibson ordered Lankford to return to the cell while Plaintiff was still cleaning up and told Lankford would be getting a ticket for being out of place.  Because Lankford returned to the cell, Plaintiff attempted to flush his waste and tena pad (for incontinence) down the toilet, which clogged the toilet. Because the toilet will only flush once per hour, Plaintiff was unable to attempt flushing it again immediately and was forced to stay in the cell with a toilet full of waste.

Plaintiff attempted to discuss his medical condition with Defendant Gibson, but he refused to allow Plaintiff a reasonable accommodation so that he could attend prison programs.  In addition, Plaintiff states that the denial of the ability to flush his toilet more than once per hour exposes him and his cellmate to dangerous toxins rising off the feces and urine in the standing water.  In addition, Plaintiff states that there have been regular incidents during which he was forced to change his incontinence briefs and clean himself in front of his cellmate.  Plaintiff states that there are other occasions during which he has to "disimpact" his feces and, because he does not have a private cell, he must do that in front of his cellmate.

Plaintiff states that on January 12, 2018, he asked Assistant Resident Unit Manager Lane, who is not named as a Defendant, if he could have bio-hazard bags for his soiled tena pads, because the pads could not be flushed down the toilet.  Lane told Plaintiff that he was not going to accommodate any prisoner by putting him into a cell by himself.  Plaintiff states that he was not seeking a single person cell, but merely a safe way to dispose of his soiled pads and an ability to flush the toilet more than one time per hour.  Plaintiff filed a grievance regarding the lack of accommodation, but Defendant Robinson rejected the grievance because it contained "multiple issues."  Plaintiff appealed the rejection of his grievance.

3

On January 24, 2018, an unnamed nurse denied Plaintiff's request for biohazard bags. Plaintiff was told to throw his waste into the regular trash can. On February 5, 2018, Plaintiff sent a kite to health care complaining about his inability to properly dispose of his tena pads. Plaintiff received a response from Defendant Ritz stating that his pads should be disposed of in the regular trash. Plaintiff states that because he has Hepatitis C, this poses a threat to his cellmate and other prisoners, especially since the trash cans are normally uncovered and open to the air and, during the summer, to insects.

On February 7, 2018, Plaintiff kited health care and stated that he could not continue to take his prescribed medication because of his toilet situation. On February 9, 2018, Plaintiff received a response stating that he should continue to take his medication until he could be seen by the medical provider. On February 9 and 12, Plaintiff had to plunge the toilet because there was not enough water pressure to flush it. Plaintiff filed a grievance, which was rejected. Plaintiff states in August of 2018, the MDOC started a dog program at IBC. As part of the program, the dog handlers were provided with bags for the dog waste, as well as a designated receptacle. Plaintiff contends that he should be allowed the same method to dispose of his waste.

On February 14, 2018, Plaintiff took his prescription medication as prescribed. On February 15, 2018, he had serious diarrhea and had to use the toilet every hour. On February 16, 2018, Plaintiff was seen by a physician's assistant (PA), who gave Plaintiff a prostate examination. After the exam, Plaintiff asked to use the bathroom because the laxatives were still giving him diarrhea. The PA told Plaintiff that he could use the bathroom, but Defendant Bussinger told him that he had to go back to his own unit, despite the fact that Plaintiff told her that he had medical permission to use the health care unit bathroom. Plaintiff states that he was unable to make it back to his unit to use the toilet and defecated on himself. Plaintiff further states that other prisoners

4

have been allowed to use the bathroom in the health care area, and that he was deliberately discriminated against. Plaintiff states that the denial of bathroom access by Defendant Bussinger violated his Eighth and Fourteenth Amendment rights.

On March 21, 2018, Plaintiff was seen by a PA, despite his request to be seen by a doctor. Plaintiff claims that medical records in the MDOC are inadequate and incomplete, and that staff are not adequately trained to meet the needs of the prison population. Plaintiff asserts that there are an insufficient number of medical doctors, and that physicians visit IBC for a total of eight hours a week, so that most prisoners are never able to be seen by a physician. This affects the quality of care received by prisoners such as Plaintiff and PAs are regularly entrusted with making crucial decisions regarding patient care. Plaintiff alleges that Defendant PA Simon falsely recorded in the medical record that Plaintiff had agreed to continue taking his medication. Plaintiff states that Defendant Corizon Health was deliberately indifferent to Plaintiff's worsening condition when staff failed to ensure he was treated by a qualified doctor or specialist.

Plaintiff complains that Defendants improperly discontinued a medication that had been prescribed for him by another doctor two years prior. On March 28, 2018, Plaintiff was taken to the hospital for an ultrasound of his liver because of his Hepatitis C. On March 30, 2018, Plaintiff sent a kite asking to see a doctor regarding his medication. Defendant Mary Corning responded by asking Plaintiff to be specific about his need to see the doctor. On April 6, 2018, Plaintiff sent a second kite stating that Defendant Simon had taken Plaintiff off his lactulose. Plaintiff states that the lactulose had been prescribed to treat the liver damage he suffered as a result of his Hepatitis C, and that the discontinuation of that drug was done solely because of cost and constituted deliberate indifference. Plaintiff was treated with other medications which were not effective. Defendant Simon also discontinued Plaintiff's Senna medication for no good reason.

5

On April 17, 2018, Defendant Langdon noted that Plaintiff's body could become addicted to the laxatives to the point where he would not be able to have a bowel movement without them. Plaintiff states that he was reliant on laxatives as a result of fifteen years of laxative abuse resulting from Defendants' treatment plan.

On May 5, 2018, Plaintiff submitted a medical kite stating that his tena pads were not catching all his waste, so Plaintiff had to keep throwing his soiled underwear in the trash. Plaintiff complained that his laxatives caused severe diarrhea, but that without them, he could not have a bowel movement.   On May 23, 2018, an x-ray showed constipation.  Plaintiff was placed back on Senna and an x-ray done on June 15, 2018, showed improvement in the constipation. Plaintiff filed grievances which were denied by Defendants Langdon, Gregurek, and Russel. Plaintiff states that the grievance responses indicated that Plaintiff had agreed with Defendant Simon's decision to change his medication.  Plaintiff states that this is a false statement and that Defendant Simon is lying to cover up his misconduct.

Plaintiff complains that he has been prevented from seeing a neurologist for the past twelve years despite the fact that he suffers from nerve damage.  Plaintiff states that this is solely because Defendant Corizon is unwilling to spend the necessary money for specialists, and that the decision has nothing to do with patient needs.  Plaintiff states that repeated delays in being able to see a doctor have also impacted his condition and have caused him mental distress which required therapy.  Plaintiff states that on September 21, 2007, a consultation request had been made on his behalf, but that he was never seen by a specialist.

On August 16, 2018, Plaintiff was seen by Defendant Simon.  On August 17, 2018, Plaintiff submitted a health care kite asking to be placed on a bowel program because he had defecated on himself earlier in the day and the odor of Plaintiff's feces upset his cellmate so much

that he wanted to fight Plaintiff. Plaintiff received a response from Defendant Ritz stating that diagnostic tests had been ordered by the medical provider. On August 20, 2018, Plaintiff requested an accommodation for unfettered access to the toilet. Plaintiff was instructed to submit his request through the grievance process. Plaintiff complied and met with Defendants Gregurek and Langdon on September 12, 2018, in order to work on addressing his needs. Plaintiff agreed to try using incontinence briefs and signed off on the grievance. Plaintiff was told to contact health care as needed.

On September 13, 2018, Plaintiff received a step I grievance response stating that he had access to a toilet in his cell and that he was claiming that forcing him to have a cellmate violated his Eighth Amendment rights because of his medical condition. On September 24, 2018, Plaintiff spoke with someone via telemed about his Hepatitis C. Plaintiff was told that his course on Harvoni had been unsuccessful and that he still had Hepatitis C. On September 28, 2018, Plaintiff began taking Vosevi for his Hepatitis C.

On October 7, 2018, Plaintiff kited health care because he was having difficulty breathing at night. On October 10, 2018, Plaintiff attempted to get information on side effects associated with Vosevi because he was beginning to feel ill. On November 18, 2018, Plaintiff defecated on himself as a result of his medical problems, which caused him to feel humiliation. Plaintiff states that he observed clean and dirty clothes being transported on the same cart.

On November 29, 2018, Plaintiff received a step III grievance response from Defendant Russel, which stated that Plaintiff's disagreement with the medical judgment of his provider did not support a claim for denial of care. On December 3, 2018, Plaintiff was seen by a PA. On December 11, 2018, Plaintiff sent a letter to Defendants Gregurek and Langdon regarding his continuing medical problems. On January 2, 2019, Plaintiff received a step II response from

Defendant Trierweiler upholding the step I rejection.  On January 8, 2019, Plaintiff filed a step III appeal, asserting that the care he received was so inadequate that it constituted a complete denial of care.

On January 9, 2019, Plaintiff kited health care because he was having a migraine headache.  Plaintiff was scheduled to see a doctor.  Plaintiff states that he had been taken off Excedrin Migraine in October of 2018, and had been told to take Ibuprofen.  Plaintiff states that the Ibuprofen was not working on his migraines.  On January 15, 2019, Plaintiff was called out to see Defendant Kevin Corning, who told Plaintiff that they were short of medical staff so it would be awhile before he could be seen by a doctor.  Defendant Kevin Corning told Plaintiff that he had an appointment on February 15, 2019.

On January 16, 2019, Plaintiff was told that he had been charged a $5.00 co-pay for his January 15, 2019, appointment.  Plaintiff does not believe he should have been charged because his migraine is a chronic condition.  Plaintiff had an administrative hearing regarding the co-pay, and he was ultimately found responsible for the payment.  Plaintiff filed a grievance regarding this issue.  On February 22, 2019, Plaintiff received a step I grievance response from Defendant Boltom stating: "prisoner claims he grieved the wrong person.  His story changed a few times.  Please remove $5.00 co-pay from account."  (Amd. Complaint, ECF No. 11, PageID.524.)

Plaintiff filed a step I grievance regarding the failure to meet his medical needs on February 14, 2019.  On February 19, 2019, Plaintiff went to the window to pick up his Senna medication and was told that it had not been renewed.  On February 20, 2019, Plaintiff sent a medical kite to Defendant Simon asking to have his Senna renewed.  Plaintiff states that without his Senna, he was only able to have a bowel movement every four to five days.  In response to his kite, RN Boucher stated that he was to take two tablets of Dulcolax every night.  On February 21,

2019, Plaintiff again attempted to have his Senna renewed, but he was told that the PA had not approved the renewal.

On February 27, 2019, Plaintiff filed a step I grievance regarding the denial of Senna.  Plaintiff was placed back on Senna on March 4, 2019, after he went six days without having a bowel movement.  Plaintiff claims that his condition has worsened as a result of being denied Senna for nearly a month.

On March 12, 2019, Plaintiff filed a step II grievance on Defendant Boltom, asserting that his response to Plaintiff's grievance on the co-pay was biased.  On April 11, 2019, Plaintiff received a denial of the grievance from Defendant Macauley.  On April 18, 2019, Plaintiff received a step II grievance denial from Defendant Alken with regard to the denial of Senna, stating that Plaintiff's prescription for Senna had been renewed on February 28, 2019.  Plaintiff states that this is false because he did not receive his Senna until March 4, 2019.  Plaintiff filed step III appeals regarding the refusal to give him Excedrin Migraine for his migraine headaches, as well as asserting the denial of medical care for his Hepatitis and his incontinence.  On June 8, 2019, Plaintiff kited that he was suffering from fifteen to twenty headaches a day.

Plaintiff claims that in the past doctors had prescribed daily Excedrin for Plaintiff to control his headaches, but that when he arrived at IBC, medical staff began to cut back on his medication in order to save money.  Plaintiff states that without his Excedrin, he is subject to excruciating headaches.  On June 10, 2019, Plaintiff kited mental health stating that he was stressed and depressed as a result of his headaches.  On June 20, 2019, Plaintiff was seen by a nurse for his headaches.  On June 24, 2019, Plaintiff was seen by a social worker because the headaches made Plaintiff depressed.  The social worker had Plaintiff placed in a "fit for life" exercise class, which Plaintiff could not tolerate because of his headaches.  On June 25, 2019, Plaintiff was seen by

Defendant Simon, who is a physician's assistant.  Plaintiff states that he should have been seen by a doctor.

Plaintiff claims that he was improperly denied the assistance of a legal writer at IBC, despite the fact that he had been approved for a legal writer at other facilities.  Plaintiff filed a grievance and appeals regarding this denial, which were denied by Defendants Macauley, Orzula, Hull, Youngs, Athearn, Robinson, and Russel.  Plaintiff states that this resulted in his inability to use the law library to exhaust his administrative remedies and to have meaningful access to the courts.

Plaintiff states that on May 9, 2019, Defendant Robinson failed to timely return his step I response.  On June 20, 2019, Defendant Robinson denied Plaintiff's request for more time to make copies for his grievance appeal.  On August 4, 2019, Defendant Orzula refused to make multiple photocopies for Plaintiff to use in the grievance process because Plaintiff did not have sufficient funds to pay for the copies.  Plaintiff states that this prejudiced his ability to file an effective grievance.  On August 16, 2019, Defendant Orzula denied Plaintiff's loan request for $0.30 to pay for three copies.  On August 20, 2019, Plaintiff wrote to the business office to ask why his account had been charged for copies that Defendant Orzula had refused to make.  Plaintiff asserts that Defendant Orzula was motivated by a desire to retaliate against him because of a grievance that he filed on Defendant Orzula in April of 2019.  On August 28, 2019, the business office credited Plaintiff's account for the amount he had been charged for copies.  Plaintiff claims that Defendants Macauley, Trierweier, Russel, Robinson, Orzula, Youngs, Hull, and Athearn knew of constitutional violations against Plaintiff but failed to correct the situation when it was within their control to do so.

On August 7, 2019, Plaintiff sent a health care kite requesting a prescription renewal.  Plaintiff received a response stating that his request had been sent to the pharmacy. Plaintiff had a doctor's appointment scheduled on August 19, 2019, but it was rescheduled, and Plaintiff was sent back to his unit.  On September 30, 2019, Plaintiff sent a health care request to renew his Zantac, Senna, and Dulcolax.  On October 2, 2019, Plaintiff received a response stating that Plaintiff did not have an active order for Dulcolax.  On October 3, 2019, Plaintiff kited health care to have his Dulcolax prescription renewed.  Plaintiff also complained that his migraine medication was not effective in treating his migraines and that it was preventing him from participating in physical activity, such as his fitness for life class.  On October 4, 2019, Plaintiff received a response stating that the medical provider would perform a chart review and look at his need for Dulcolax, and that he would be scheduled for an appointment to address his migraines.

On October 11, 2019, Plaintiff was seen by a nurse practitioner, who told Plaintiff that she would look at his medical records and get back to Plaintiff regarding his medications. Plaintiff never heard from her again.  On October 13, 2019, Plaintiff sent another kite requesting Dulcolax.  Plaintiff was told that his prescription had expired on September 14, 2019, and that a chart review would be done.  On October 18, 2019, Plaintiff was told that he did not need Dulcolax because he was taking two other stool softeners.  Plaintiff states that every time he was taken off Dulcolax, it caused him to go without a bowel movement for five to six days.  Plaintiff filed a grievance regarding the denial of Dulcolax on October 23, 2019.  Plaintiff states that, in order to have a bowel movement, he required three Senna and three Dulcolax a day.  Plaintiff asserts that the decision to discontinue his Dulcolax was based solely on saving money.

On October 24, 2019, Plaintiff went to the hospital for an ultrasound related to his Hepatitis C.  On October 25, 2019, Plaintiff received a grievance response stating that because

Plaintiff was receiving Senna, two tablets twice a day, and magnesium citrate, one bottle per week, he did not need Dulcolax.  On October 29, 2019, Plaintiff went to health care because he had not had a bowel movement for six days.  On October 30, 2019, Plaintiff received a notice of intent to charge him a $5.00 co-pay for this visit.  On November 4, 2019, Plaintiff again had to go to health care because he had not had a bowel movement for six days.  Plaintiff again requested a renewal of his Dulcolax.

On November 20, 2019, Plaintiff had an appointment with a doctor, which was cancelled due to a prison lock-down.  On November 30, 2019, Plaintiff sent a kite to health care because he was going five to six days without a bowel movement and was experiencing abdominal and back pain.  Plaintiff received a response stating that he would be scheduled for an appointment. Plaintiff was unable to attend his fitness for life classes due to back pain and filed a grievance on December 2, 2019.  On December 7, 2019, Plaintiff was unable to do his work assignment because of back pain.  Plaintiff continued to send kites requesting to be placed back on Dulcolax and complaining of back pain.

On December 16, 2019, Plaintiff received a falsified step II grievance response from Defendant Alken, stating that he had been seen by a medical professional on November 20, 2019, and that Plaintiff had refused adding Miralax to his medications and discontinuing his magnesium citrate.  Plaintiff states that this response was based on a false entry in his medical record by Defendant Sices.  On December 18, 2019, Plaintiff sent another kite.  On December 19, 2019, Plaintiff was told that Senna and Dulcolax had been ordered, and that Zantac had been replaced with Pepcid.  Plaintiff received his medications on December 20, 2019.  On December 26, 2019, Plaintiff was told that his magnesium citrate had been stopped because he was taking Dulcolax.

Plaintiff filed a grievance regarding the discontinuation of his magnesium citrate which was denied.  Plaintiff states that he filed his step III appeal of this grievance by placing it in the mail on December 30, 2019.  Plaintiff was later informed that it had not been received until January 22, 2020, and was rejected as late.  Plaintiff states that mail sent the same day to the district court was received within five days and that if his step III grievance was late, it was out of his control.

On January 8, 2020, Plaintiff told Defendant Sices that he had not been given enough Dulcolax for the month of December.  Defendant Sices told Plaintiff that he had ordered Plaintiff sufficient medication, but that non-physicians refused to carry out his orders.  Plaintiff filed a complaint with the Michigan State Police alleging fraud by Defendants Simon and Sices for falsifying Plaintiff's medical records.

Plaintiff claims that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments.  Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

## II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

13

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P.

8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under

28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a

right secured by the federal Constitution or laws and must show that the deprivation was committed

by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr.

Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating

federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271

(1994).

## III.    Respondeat Superior

Initially the Court notes that Plaintiff fails to make specific factual allegations

against Defendants Macauley, Ivens, Gregurek, Hutchinson, Russel, Trierweiler, Boltom, Valentin,

Youngs, Hull, and Athearn, other than his claim that they failed to conduct an investigation in

response to his grievances or failed to supervise their subordinates.  Government officials may not

be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat

superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc.

Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed

14

constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendants Macauley, Ivens, Gregurek, Hutchinson, Russel, Trierweier, Boltom, Valentin, Youngs, Hull, and Athearn engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them.

## IV.    Interference with grievance process

Plaintiff claims that Defendants Robinson and Orzula interfered with his ability to file grievances when they denied his request for legal assistance and copies, and failed to return his grievances in a timely fashion or to grant him an extension of time to appeal.  Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan*

*v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, the actions of Defendants Robinson and Orzula did not deprive him of due process.

Nor was Petitioner's First Amendment right to petition the government violated by the failure of Defendants Robinson and Orzula to process or act on his grievances.  The First Amendment "right to petition government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

Moreover, the actions of Defendants Robinson and Orzula have not barred Plaintiff from seeking a remedy for his grievances. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415-16 (6th Cir. 2014) (citing *N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by his pro se invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982). Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821-24 (1977). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and

16

exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1858-59 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470 (6th Cir. 2001). In light of the foregoing, the Court finds that Plaintiff's claim that Defendants Robinson and Orzula violated his First Amendment right to petition the government is properly dismissed for lack of merit.

## V.     Retaliation

Plaintiff claims that Defendant Orzula retaliated against him in violation of the First Amendment on August 4, 2019, by denying Plaintiff's request for copies because of a prior grievance filed by Plaintiff on April 28, 2019. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). The Court will assume without deciding that Plaintiff filed a nonfrivolous grievance against Defendant Orzula.

The Court also will assume without deciding that the denial of some number of photocopies could rise to the level of adverse action.

However, Plaintiff fails to allege facts showing that Defendant Orzula's denial of copies was motivated by a desire to retaliate against Plaintiff.  Although temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive,'"  *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)), "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004).  Moreover,

> . . . *Muhammad* does not stand for the proposition that temporal proximity alone is sufficient to create an issue of fact as to retaliatory motive.  In *Muhammad* the Sixth Circuit did not resolve the issue, but merely observed that "temporal proximity alone **may be** 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Id.* at 418 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004) (emphasis added).  Even if temporal proximity may in some cases create an issue of fact as to retaliatory motive, it would only be sufficient if the evidence was "significant enough." Plaintiff's conclusory and ambiguous evidence is not "significant enough" to create an issue of fact as to retaliatory motive.

*Brandon v. Bergh*, No. 2:08-cv-152, 2010 WL 188731, at *1 (W.D. Mich. Jan. 16, 2010).

In this case, Plaintiff fails even to allege temporal proximity.  Plaintiff alleges only that, among his many prior grievances, he filed one grievance against Defendant Orzula approximately four months before Orzula's allegedly adverse action.  Such an allegation is insufficiently proximate to raise an inference of retaliatory motive.  Further, Plaintiff fails to allege any other facts in support of his claim that Defendant Orzula's denial of copies was motivated by a desire to retaliate against him.  Therefore, this claim is properly dismissed.

## VI.     Improper charge for copies

Plaintiff claims that Defendant Orzula violated his due process rights by charging him $0.30 for copies that he never received.  Plaintiff's due process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).  Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law."  *Parratt*, 451 U.S. at 537.  This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).  Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies.  *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993).  Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action.  *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not and cannot meet his burden.  Plaintiff has not alleged that state post-deprivation remedies are inadequate.  The Sixth Circuit has found that Michigan law provides "several adequate post-deprivation remedies" to a prisoner asserting improper removal of money from his prison account.  *Copeland*, 57 F.3d at 480.  In a number of cases similar to this one, the Sixth Circuit has affirmed dismissal where the inmate failed to allege and show that state law post-deprivation remedies were inadequate.  *Id.* at 479-80 (money wrongly removed from prison account); *Lillie v. McGraw*, No. 97-3359, 1997 WL 778050, at *1 (6th Cir. Dec. 12, 1997) (officials allegedly broke television); *Mowatt v. Miller*, No. 92-1204, 1993 WL 27460, at *1 (6th Cir. Feb. 5, 1993) (misapplication of money to a deficit in prison account); *Shabazz v. Lecureux*,

19

No. 85-2014, 1986 WL 16140, at *1 (6th Cir. Dec. 5, 1986) (illegal appropriation of money from prisoner account). Moreover, even if Plaintiff had stated a claim under the Fourteenth Amendment, he admits that he received a credit for $0.30, the amount that he was improperly charged. Therefore, it is clear that Plaintiff received all the process that he was due. Accordingly, the court will dismiss this claim.

## VII. Eighth Amendment

Plaintiff claims that Defendants Stieve, Alken, Langdon, Simon, Hutchinson, Corizon, Mary Corning, Robinson, and Kevin Corning violated his Eighth Amendment rights by changing his medications so that he was at varying times he was deprived of Senna, Dulcolax, lactolase, or other medications. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cty.*, 534 F.3d 531, 540 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is

detectable to the eye.  Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear.  *See, e.g., Rouster v. Cty. Of Saginaw*, 749 F.3d 437, 466, 451 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious).  If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer,* 511 U.S. at 835.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.  *Estelle*, 429 U.S. at 105.  As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).  Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.  *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *see also Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).  "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  He must

demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

"[T]he right to adequate medical care does not encompass the right to be diagnosed correctly[.]" *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005); *see also Jones v. Muskegon County*, 625 F.3d 935, 944-45 (6th Cir. 2010) (finding that the doctor's initial incorrect diagnosis of severe constipation, even "in light of [the prisoner's] substantial weight loss and sharp stomach pain[,]" amounted only to negligence given the prisoner also complained of his "inability to have a bowel movement for several days and other stomach pains, which could have been consistent with [the doctor's] diagnosis").

In this case, Plaintiff allegations indicate that he was seen on numerous occasions for his various medical conditions, including his Hepatitis C and his inability to have a bowel movement without taking laxatives and stool softeners. Plaintiff states that his laxatives cause severe diarrhea, but that without them, he cannot have a bowel movement. Plaintiff's medications have been changed at various times in an attempt to address his medical issues. Plaintiff claims that at times the changes in his medications have caused him to suffer from severe constipation, and at other times from diarrhea and fecal incontinence. Plaintiff's Hepatitis C medications have also been changed because Harvoni was not effective in curing his Hepatitis C, and that his new Hepatitis C medication caused him to feel ill. However, as noted above, a disagreement over specific medications and treatment does not rise to the level of an Eighth Amendment violation. Nor does the denial of biohazard bags to dispose of his incontinence pads by Defendant Ritz deprive Plaintiff of care for a serious medical need. Because it is clear that Plaintiff is asserting a

difference of opinion over his treatment, rather than a denial of treatment, his Eighth Amendment medical claims are properly dismissed for lack of merit.

In addition, even if Plaintiff was able to show that his medical care violated the Eighth Amendment, Defendant Corizon may not be held liable simply because its employees may have acted with deliberate indifference to his serious medical needs. As the Court explained in *Iqbal,* there is no vicarious or *respondeat superior* liability under § 1983. *See Iqbal,* 556 U.S. at 676. In the context of a municipality, a plaintiff cannot establish the municipality's liability unless he shows that "deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 415 (1997). In asserting a claim against a municipality, a plaintiff therefore must establish both (1) an underlying violation of his constitutional rights, and (2) that the violation resulted from the municipality's own deliberately indifferent policies. *See Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992) (explaining that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."); *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."). This rule of municipal liability applies equally to private corporations that are deemed state actors for purposes of § 1983. *See Street,* 102 F.3d at 817-18; *see also, Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (citing cases); *Dashley v. Corr. Med. Servs., Inc.,* 345 F. Supp. 1018, 1021 (E.D. Mo. 2004). Thus, Defendant Corizon "although clearly a state actor and therefore a proper party to this § 1983 action, cannot be held vicariously liable for the actions of its agents. *Starcher v. Corr. Med. Sys.,*

*Inc.,* 7 Fed. Appx. 459, 465 (6th Cir. 2001). Rather, Defendant Corizon's liability must be premised on some policy that caused a deprivation of Plaintiff's Eighth Amendment rights. *Id.*

In order to establish that the alleged constitutional violations resulted from an illegal policy or custom, Plaintiff can rely on Defendant Corizon's official policies, actions taken by officials with final decision-making authority, a policy of inadequate training or supervision, or a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005). In this case, Plaintiff fails to allege any specific facts showing the existence of such a policy or custom. Moreover, as noted above, Plaintiff has failed to show that Defendant Corizon's employees acted with deliberate indifference. Therefore, Plaintiff's Eighth Amendment claim against Defendant Corizon must also be dismissed.

Plaintiff also claims that Defendants Gibson and Bussinger violated his Eighth Amendment rights by subjecting Plaintiff to unconstitutional conditions of confinement. Allegations about temporary inconveniences, e.g., being deprived of a lower bunk, subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft,* 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)); *see also Hartsfield v. Vidor,* 199 F.3d 305, 310 (6th Cir. 1999) (stating that "deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment") (citing *Stephens v. Carter Cnty. Jail*, 816 F.2d 682 (6th Cir. 1987)). *But see Flanory v. Bonn*, 604 F.3d 249, 255-56 (6th Cir. 2010) (holding that allegations that an inmate was deprived of toothpaste for 337 days and experienced dental health problems

did not constitute a temporary inconvenience and were sufficient to state an Eighth Amendment claim).

However, in *Barker v. Goodrich*, 649 F.3d 428, 435 (6th Cir. 2011), the Sixth Circuit held that placing inmate in uncomfortable restraints for 12 hours, during which he missed one meal and did not have access to water or a toilet rose to the level of an Eighth Amendment violation. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002) (finding an Eighth Amendment violation in the handcuffing of a prisoner to hitching post for seven hours in the hot sun without access to water). The court also held that the right was clearly established in 2007. *Id.*, 435.

In this case, Plaintiff claims that Defendant Bussinger refused to allow Plaintiff to use the bathroom in the health care unit following his appointment on February 16, 2018, despite the fact that Plaintiff was suffering from diarrhea and had been given permission to use the bathroom by the physician's assistant. Plaintiff states that he was unable to make it back to his unit to use the toilet and defecated on himself, which caused him to suffer humiliation.

With regard to Defendant Gibson, Plaintiff alleges that on January 12, 2018, he defecated on himself due to his medical condition and that Defendant Gibson refused to allow Plaintiff's cellmate to remain in the day room while Plaintiff cleaned himself. Because Plaintiff's cellmate returned to the cell before Plaintiff finished cleaning up, he attempted to flush his waste and tena pad (for incontinence) down the toilet, which clogged the toilet. Because the toilet could only be flushed once per hour, Plaintiff was unable to attempt flushing it again immediately and was forced to stay in the cell with a toilet full of waste. Plaintiff states that the denial of the ability to flush his toilet more than once per hour exposes him and his cellmate to danger toxins in the form of feces and urine in standing water. In addition, Plaintiff states that there have been regular incidents during which he was forced to change his incontinence briefs and clean himself in front

of his cellmate, and that on other occasions Plaintiff has to "disimpact" his feces in front of his

cellmate.

In a similar case filed by two prisoners at the Macomb Correctional Facility, the

Sixth Circuit stated:

> The Eighth Amendment prohibits prison officials from depriving an inmate of "the minimal civilized measure of life's necessities." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal quotation marks omitted). And it "draws its meaning from the evolving standards of decency that mark the progress of a maturing society," *Hudson*, 503 U.S. at 8 (internal quotation marks omitted). "Fundamentally, the concept underlying the Eighth Amendment is nothing less than the dignity of humankind." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotations and alterations omitted).

> Plaintiffs' statements at the preliminary-injunction hearing and in their affidavits reflect that if they are forced to regularly disimpact or soil themselves in front of their cellmate, they would suffer considerable humiliation. Ritchie says that given his difficulties with his bowels, having a cellmate would cause him to "suffer humiliation and have [other inmates] running around saying you're doing this on yoursel[f]." Ritchie's claim of humiliation is backed by his conduct: he waits until Howard goes to eat to "chang[e] his Depends and remov[e] the feces from his body cavity." (R. 1, PID 31.) And Howard has averred that the first time he saw Ritchie engaging in this process, Ritchie "pulled the blanket over himself" and, the next day, "could not look [Howard] in the eye." (R. 36, PID 357.) Berryman also says that one reason he needs his own cell is to avoid the "humiliation of [disimpacting his feces] in front of another person."

> Precedent also indicates that the indignity a prisoner experiences when he is forced to soil his clothing in front of another prisoner (or has to disimpact his feces in front of another prisoner) is an affront to the Eight Amendment. In *Hazelton v. New Hampshire Department of Corrections*, the court addressed a situation where an inmate could only delay defecating for about five minutes and the prison was either not promptly providing nearby bathroom access or requiring the inmate to terminate his activities (e.g., visitation) so he could promptly return to the bathroom in his unit. *See* No. 08-CV-419-JL, 2009 WL 229664, at *2-4 (D.N.H. Jan. 27, 2009). The inmate had, on at least a few occasions, defecated on himself. *Id.* at *2, 3. In granting a preliminary injunction based on a violation of the Eighth Amendment, the court reasoned, "Hazelton adduced evidence that showed he was denied any modicum of human dignity when he was made to soil himself on the way to the bathroom because he was denied quick access to a nearby bathroom, or was made to soil himself in front of other people, including visiting family members, when he was refused the use of a nearby bathroom." *Id.* at *9.

> Thus, *if* Defendants are knowingly forcing Ritchie to, more than rarely, defecate on his clothing in front of his cellmate, defecate in his incontinence briefs but then change his soiled briefs and wipe himself clean in front of his cellmate, or disimpact his feces in front of his cellmate, then Ritchie might well be able to establish an Eighth Amendment violation.

*Berryman v. Haas*, No. 17-CV-10762, 2017 WL 3224970, at *6 (E.D. Mich. July 31, 2017).

The Court concludes that based on the facts as stated in the complaint, Plaintiff's Eighth Amendment claims against Defendants Bussinger and Gibson are not clearly frivolous and may not be dismissed on initial review.

## VIII.   Equal protection

Plaintiff states that Defendant Bussinger violated his Fourteenth Amendment right to equal protection when he denied Plaintiff the use of the health care unit bathroom despite the fact that other prisoners have been allowed to use that bathroom.  The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Plaintiff does not suggest that he is a member of a suspect class, and "prisoners are not considered a suspect class for purposes of equal protection litigation."  *Jackson v. Jamrog,* 411 F.3d 615, 619 (6th Cir. 2005); *see also Wilson v. Yaklich,* 148 F.3d 596, 604 (6th Cir. 1998).  In addition, prisoners do not have a fundamental right to photocopies under the Constitution.

Because neither a fundamental right nor a suspect class is at issue, Plaintiff's claim is reviewed under the rational basis standard.  *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006).  "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions

were irrational.'"  *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)).  To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  To be a similarly-situated person, "the comparative [prisoner] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.'"  *Umani v. Mich.  Dep't of Corr.*, 432 F. App'x 453, 460 (6th Cir. 2011) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'").  Plaintiff alleges disparate treatment here, but his allegations are conclusory.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Because Plaintiff fails to allege any specific facts regarding other inmates who were allegedly allowed to use the health care unit restroom, much less that Defendant Bussinger allowed them to do so, his equal protection claim against Defendant Bussinger is properly dismissed.

## IX.    Pending motion for counsel

Plaintiff has filed a motion for appointment of counsel.  Indigent parties in civil cases have no constitutional right to a court-appointed attorney.  *Abdur-Rahman v. Mich. Dep't of*

*Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604-05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604-05; *see Mallard v. U.S. Dist. Court*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances.  In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel.  *See Lavado*, 992 F.2d at 606.  The Court has carefully considered these factors and determines that, at this stage of the case, the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position.  Therefore, Plaintiff's request for appointment of counsel (ECF No. 12) is properly denied

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Macauley, Stieve, Alken, Langdon, Ivens, Gregurek, Simon, Hutchinson, Corizon, Mary Corning, Robinson, Russel, Ritz, Trierweier, Boltom, Valentin, Kevin Corning, Orzula, Youngs, Hull, Athearn, and Sices will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, Plaintiff's equal protection claim against Defendant Bussinger. Plaintiff's Eighth Amendment claims against Defendants Bussinger and Gibson remain in the case.

An order consistent with this opinion will be entered.


Dated:   September 3, 2020               /s/ Janet T. Neff
                                        Janet T. Neff
                                        United States District Judge

30